UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

MIA McMURTRY,

        Plaintiff,

        v.                            Case No. 07-C-1119

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration,

        Defendant.

ORDER REVERSING THE DECISION OF
AND REMANDING CASE TO THE COMMISSIONER

        Plaintiff, Mia McMurtry, filed for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) on March 16 and April 20, 2004, respectively. Her applications were denied initially and on reconsideration. McMurtry requested an administrative hearing, which was conducted on May 3, 2007. (Tr. 274.[1]) McMurtry, who appeared with counsel, testified at the hearing as did vocational expert (VE) Allen Searles. (Tr. 274-302.) On July 14, 2007, Administrative Law Judge (ALJ) Gregory S. Pokrass concluded that McMurtry was not disabled within the meaning of the Social Security Act and was not entitled to DIB or SSI. (Tr. 13-24.) The Appeals Counsel denied McMurtry's request for review on September 8, 2007, making the ALJ's determination the final decision of the Commissioner. (Tr. 4-6.) McMurtry now seeks judicial review.

STANDARD OF REVIEW

        Under 42 U.S.C. § 405(g), this court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and is based on the proper legal

---

[1]"Tr." refers to the administrative transcript filed on October 14, 2008, at docket 14.

criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).[2] The ALJ's findings of fact, when supported by substantial evidence, are conclusive. § 405(g). Substantial evidence is relevant evidence that a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). This court cannot reweigh evidence or substitute its judgment for that of the ALJ. *Binion ex rel. Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). However, if the ALJ commits an error of law reversal is required without regard to the volume of evidence supporting the factual findings. *Id.* Failure to follow the Commissioner's regulations and rulings constitutes legal error. *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

An ALJ must "'minimally articulate his reasons for crediting or rejecting evidence of disability,'" *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992)), "build[ing] an accurate and logical bridge from the evidence to his conclusion," *id.* at 872. Although the ALJ need not discuss every piece of evidence, he or she cannot select and discuss only the evidence supporting the decision. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect that examination. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). If the ALJ's decision lacks evidentiary support or is "so poorly articulated as to prevent meaningful review," the district court should remand the case *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (internal quotation marks omitted). However, a "sketchy

---

[2]The right to review of SSI claims falls under 42 U.S.C. § 1383(c), but the standard is the same as under § 405(g). *See* § 1383(c)(3).

opinion" may be sufficient if it is clear the ALJ considered the important evidence and the ALJ's reasoning can be traced. *Id.* at 787.

To obtain DIB and SSI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.

The Administration has adopted a sequential five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The ALJ must determine at step one whether the claimant is currently engaged in substantial gainful activity. If so, she is not disabled. If not, at step two the ALJ must determine whether the claimant has a severe physical or mental impairment. If not, the claimant is not disabled. If so, at step three the ALJ determines whether the claimant's impairments meet or equal one of the impairments listed in the Administration's regulations, 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"), as being so severe as to preclude substantial gainful activity. If so, the claimant is found disabled. If not, at step four the ALJ determines the claimant's residual functional capacity (RFC) and whether the claimant can perform her past relevant work. If she can perform her past relevant work she is not disabled. However, if she cannot perform past work, then at step five the ALJ determines whether the claimant has the RFC, in conjunction with age, education, and work experience, to make the adjustment to other work. If the claimant can make the adjustment, she is found not disabled. If she cannot make the adjustment, she is found disabled. 20 C.F.R. 404.1520; *see Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

RFC is the most the claimant can do in a work setting despite his or her limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p; *Young*, 362 F.3d at 1000-01. The Administration must consider all of the claimant's known, medically determinable impairments when assessing RFC. § 404.1545(a)(2), (e).

The burden of moving forward at the first four steps is on the claimant. At step five, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of other jobs that exist in the national economy. *See Young*, 362 F.3d at 1000.

## BACKGROUND

McMurtry alleges that she has been unable to work since December 31, 2003. (Pl.'s Br. 1; Tr. 62.) She worked as a cook from 1985 to 1989, a stadium vendor in 1992, a housekeeper and dietary aid from 1993 to 1995, and a child care worker from 1995 to 2000. (Tr. 67, 109, 110, 279-80.) McMurtry's work experience came to a halt after a car accident in 2001. (Tr. 280.)

She complains that back pain, pain breathing, pain in her legs and knees, an ankle sprain, and asthma affect her ability to work. (Tr. 66, 253, 281-84.) In her disability report for her appeal, McMurtry included high blood pressure and "swelling due to excess body water" in the list of conditions ailing her. (Tr. 100.) She has added obesity, testifying at her administrative hearing that she had weighed 331 pounds before bariatric surgery and at the time of the hearing was about 250 pounds at five feet, seven and one-half inches tall. (Tr. 278-79.) Also, McMurtry testified regarding heavy uterine bleeding and abdominal pain. (Tr. 288.) Her opening brief in this court noted fatigue, migraine headaches, anemia and chronic edema of the feet. (Pl.'s Br. 2-3.)

4

In addition, McMurtry has complained of dizziness and excessive sedation due to medication. (*See* Tr. 239.) In the words of her friend, Charles Goldsmith, in a third-party report, McMurtry "is always stressed because of the meds," "can't handle routine too well," and because of the medication "she's either too sleepy or too drowsy to do anything." (Tr. 96.) He said she used to be social but "now with the medication, pain and sometime[s] lack of sleep she can't be as socialable [sic] as she was." (Tr. 95.) In a handwritten letter to the ALJ McMurtry wrote: "I need outside help basically on a daily basics [sic]. . . . If its [sic] not the pain, its [sic] the drowsiness that keeps me from being a complete person." (*Id.* 42-43.)

McMurtry has been prescribed Tylenol #3, Ultram, and Flexeril for pain and muscle spasms, in addition to other medications. (Tr. 120, 122, 124.) Recommended measures to address her pain include physical therapy, ultrasound and electrical stimulation of the sacroiliac joint area, aggressive stretching (Tr. 149), as well as a back brace with a TENs unit, which provides electrical pulses to the lower back. (Tr. 159.) McMurtry was wearing the back brace with the TENs unit at the hearing before the ALJ and testified that she used them daily at home, even in bed at night. (Tr. 281-82.)

The ALJ concluded that McMurtry was not disabled following the five-step test and finding that: (1) McMurtry had not engaged in substantial gainful activity since the alleged onset of disability; (2) she suffered from impairments considered "severe" under 20 C.F.R. 416.920(c)[3]; (3) her impairments did not meet or equal any of the listings; (4) she could not perform her past relevant work; but (5) she has the RFC to perform the

---

[3]A severe impairment is one that "significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c).

sedentary, unskilled jobs of a call out operator, surveillance system monitor, and order clerk, which exist in significant numbers.  (Tr. 18-23.)

DISCUSSION

McMurtry raises six points on appeal.

(1)    The ALJ's Failure to Include the Prior Record

First, McMurtry argues that evidence and the decision regarding a previous application for benefits should have been included in this record and the ALJ's failure to incorporate those materials was an error of law warranting remand.  It appears that McMurtry had filed a previous claim for benefits that was denied with a decision in June 2003.  (Tr. 43, 150; Pl.'s Br. at 7.)  As noted above, the claims underlying this case were filed in March and April 2004.

The ALJ must develop a full and fair record, *Smith v. Sec'y of Health, Educ. & Welfare,* 587 F.2d 857, 860 (7th Cir. 1978), even when the claimant is represented by counsel, *see, e.g., Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 513 (7th Cir. 1999).  The factors considered include whether the ALJ obtained all relevant medical and treatment records from plaintiff's treating physicians; whether the ALJ elicited detailed testimony from the plaintiff at the hearing; and whether the ALJ probed all relevant areas, questioning plaintiff about the medical evidence in the file, including medication, pain, daily activities, and physical abilities.  *See Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994) (finding that the ALJ's compliance with these requirements led to a full and fair record).  Although there is no hard and fast standard that delineates what constitutes a full and fair development of the record, "'a significant omission is usually required before this court will find that the Secretary failed to assist pro se claimants in developing the record fully and

6

fairly.'" *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir.1997) (quoting *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994)). "In other words, the omission must be prejudicial." *Nelson*, 131 F.3d at 1235.

Although McMurtry contends that the ALJ should have considered medical records from her prior claim, she fails to specify the records and how they would make a difference. Although McMurtry submits that only the Commissioner has access to the prior hearing record and that she should not be expected to point out what was missing, she should be aware of what was in the record inasmuch as she likely attended the prior hearing and received the earlier decision. Regardless, in this case the ALJ heard McMurtry's testimony and had several medical records from treating physicians. Moreover, the unfavorable decision and record from the prior claim did not lead to a finding that plaintiff was eligible for benefits. Hence, it is difficult for this court to understand how unspecified materials would change the decision on plaintiff's application for benefits.

As the Commissioner argues in his response brief, McMurtry was represented at her administrative hearing; her attorney raised no issues and made no objections when he and the ALJ were discussing proposed exhibits. Also, the Seventh Circuit in *Skinner v. Astrue,* 478 F.3d 836, 842 (7th Cir. 2007), has said that "a claimant represented by counsel is presumed to have made his best case before the ALJ."

McMurtry submits that the ALJ committed legal error by not complying with the Hearings, Appeals and Litigation Law Manual ("HALLEX") I-2-6-58, which states in pertinent part:

> The ALJ must obtain records of a prior hearing and decision (i.e., the exhibits, exhibit list and decision), and add them to the current list of exhibits. The ALJ must admit any prior hearing

7

records into the record of the current case if they are relevant to the current case or are mentioned at the current hearing. The ALJ must admit any prior records that are mentioned in the current hearing decision. If the ALJ decides not to obtain and admit such prior records into the record of the current case (e.g., the ALJ decides they are not relevant to the current case), he or she must explain at the hearing and in the decision why they are not being admitted.

Office of Disability Adjudication and Review HALLEX, www.ssa.gov/OP_Home/hallex/I-02/I-2-6-58.html (last visited 9/16/10).

The HALLEX provides "'guiding principles, procedural guidance and information'" to ALJs and staff at the Administration. *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 397 (6th Cir. 2008) (quoting HALLEX § I-1-001); *Moore v. Apfel*, 216 F.3d 864, 868-69 (9th Cir. 2000). The Seventh Circuit has not addressed whether the HALLEX provides rules of law that the ALJs must follow or risk reversal. *Blake v. Astrue*, No. 1:08-cv-1268-LJM-DML, 2010 WL 679077 (S.D. Ind. Feb. 22, 2010); *see Cromer v. Apfel*, No. 00-1858, 2000 WL 1544778, *2-*3 (7th Cir. Oct. 16, 2000). However, the Supreme Court and Seventh Circuit have found that other guides issued by the Administration do not constitute rules on which a claimant can rely for arguments of legal error. *See Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) ("[T]he Claims Manual is not a regulation. It has no legal force, and it does not bind the SSA. Rather, it is a 13-volume handbook for internal use by thousands of SSA employees . . . ."); *Parker ex rel. Lamon v. Sullivan*, 891 F.2d 185, 190 & n.4 (7th Cir. 1989) (stating that the POMS manual—a handbook for internal use by employees of the Administration—"has no legal force and therefore the standard cannot be controlling in this case"). The Ninth Circuit has rejected the argument that the HALLEX

has any binding authority. *Moore*, 216 F.3d at 868-69.[4] District and magistrate judges within the Seventh Circuit have found the same. *E.g., Zoromski v. Astrue*, No. 07-cv-463-jcs, 2008 WL 3656228, *10 (W.D. Wis. Mar. 4, 2008) (Crabb, J.) (stating in case where plaintiff argued that the Administration failed to process evidence correctly under the HALLEX that "the HALLEX manual is not binding on the agency and has no legal force"); *Gardner v. Barnhart*, No. 02 C 4578, 2004 WL 1470244 (N.D. Ill. June 29, 2004) (Ashman, M.J.) (stating that the "HALLEX does not carry the authority of law"); *accord Taylor v. Astrue*, No. C-07-05549 EDL, 2008 WL 3823718, *3 (N.D. Cal. Aug. 13, 2008) ("[A]s an internal procedure manual, HALLEX does not impose judicially enforceable duties upon the agency.").

Under 20 C.F.R. § 404.1512(d) the Commissioner states that "[b]efore we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application." *See also* 20 C.F.R. § 416.912(d). "Medical history," is defined as "the records of your medical source(s) covering at least the 12 months preceding the month in which you file your application." 20 C.F.R. §§ 404.1512(d)(2); 416.912(d)(2). However, the ALJ decision on McMurtry's prior claim was not a medical source record. Moreover, McMurtry asserted disability as of December 31, 2003, less than twelve months before she filed her

_____

[4]Although the Fifth Circuit has agreed that the HALLEX does not carry the authority of law, it noted that "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required. If prejudice results from a violation, the result cannot stand." *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (citations and quotation marks omitted). Whether prejudice exists here is speculation.

application. Thus, it is unclear how medical records from a claim fully decided in June 2003 would be material to a disability that did not even start until six months later.

McMurtry mentions the Due Process Clause and *Mathews v. Eldridge*, 424 U.S. 319 (1976), contending that "[d]ue process protections of the right to a fair hearing apply to disability insurance hearings at the Social Security Administration, including the right to see and confront the entire record" (Pl.'s Br. 7). However, *Mathews* involved the right to an evidentiary hearing before the SSA could terminate benefits and is inapposite. The issue in *Mathews* was whether due process compelled the Administration to hold an evidentiary hearing, not the contents of the record during the administrative proceedings for terminating benefits.

Additionally, McMurtry cites *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991), for the proposition that "'it is a basic obligation of the ALJ to develop a full and fair record.'" (Pl.'s Reply 1.) In *Thompson*, after the Secretary denied the claimant's application, the claimant requested a hearing before an ALJ. At the hearing, the claimant appeared without counsel and again was denied disability benefits. On judicial review, Thompson complained that records used in the initial denial of his claim for benefits were not considered by the ALJ. 933 F.2d at 587. In those records were reports that the Seventh Circuit found "could have provided vital information regarding Thompson's disability status as of the time last insured." *Id.* As a result, the Seventh Circuit reversed the district court's decision granting summary judgment to the Secretary.

*Thompson* was predicated on the claimant appearing before the ALJ pro se. Here, plaintiff was represented by counsel at the most recent hearing before the ALJ. In *Hawkins v. Chater,* 113 F.3d 1162, 1167 (10th Cir. 1997), the Tenth Circuit observed that

"in a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development."  Here, McMurtry's counsel failed to raise with the ALJ the issue of whether the 2003 hearing record and decision should have been included in the record for the hearing now at issue.  Consistent with the policy that represented claimants for Social Security benefits are presumed to have brought their most persuasive arguments for benefits before the ALJ, McMurtry may not complain at this stage of the absence of the materials she believes will support her SSI and DIB claims.

(2)     The Severity of Plaintiff's Impairments and Step Two

        Next, plaintiff argues that the ALJ "failed to properly consider the severity of all of plaintiff's impairments," in particular her excessive uterine bleeding, abdominal pain, ovarian cysts, fatigue, depression, and memory loss.  (Pl. Br. 7-8.)  At first glance, this allegation appears to challenge the ALJ's decision at step two.  The Commissioner maintains that any concern with step two is moot because the ALJ found at least one severe impairment.  (Def.'s Resp. 13 (citing *Raines v. Astrue*, 2007 WL 1455890, *7 (S.D. Ind. Apr. 23, 2007) ("As long as the ALJ proceeds beyond step two . . . no error could result solely from his failure to label an impairment as 'severe.'").)  This is so because "[a]t later stages, the ALJ evaluates a claimant's ability to work based on the totality of his impairments, whether they are deemed severe or not."  *Raines*, 2007 WL 1455890, at *7.

        For the purposes of fulfilling step two of the sequential five-step disability determination process, it is irrelevant whether the ALJ considered additional impairments, as he found in McMurtry's favor at that step.  However, this court will address these arguments in section (6) as they relate to McMurtry's RFC.

11

(3)     Step Three Listing Requirements

McMurtry asserts infirmities in the ALJ's decision at step three. Generally, McMurtry relies on *Barnett v. Barnhart*, 381 F.3d 664 (7th Cir. 2004), and *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003), for the proposition that, "[i]n considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett*, 381 F.3d at 668.  She contends that the ALJ failed to properly consider her obesity in the medical equivalence calculus.  In support of this contention, McMurtry points to a former listing regarding obesity, Listing 9.09,  which has since been rescinded, *see* SSR 02-1p.

Under 20 C.F.R. § 404.1526(a):  "Your impairment(s) is medically equivalent to a listed impairment in appendix 1 of subpart P of part 404 of this chapter if it is at least equal in severity and duration to the criteria of any listed impairment."  Medical equivalence may be found for impairments described in the listings but for which the claimant does not meet all of the findings and for impairments closely analogous to listed impairments. § 404.1526(b).

The ALJ's entire step three analysis reads as follows:

> No physician has indicated findings that would satisfy the severity requirements of any listed impairment. Specifically, the undersigned considered the claimant's back condition under Listing 1.04.  However, the record does not indicate any neurological deficits such as sensory loss, muscle weakness or atrophy (see Exhibit B3F p.2).  There is no indication of pseudoclaudication or arachnoiditis.  In fact, the only objective finding is that the claimant has some disc dehydration at the L5-S1 level (Exhibit B9F p.7).  The claimant does not have an impairment or combination of impairments that meets or medically equals any listed impairment.

(Tr. 19.)  The ALJ did identify listing 1.04, for disorders of the spine, and mentioned the lack of evidence for meeting any of the three options of satisfying that listing with neurological deficits, arachnoiditis, or pseudoclaudication.  But his discussion is perfunctory as to medical equivalence.

Longstanding Administration policy requires a physician's medical opinion on equivalence.  SSR 96-6p; *see* § 404.1526(c) ("We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner.").  The signature of an agency medical consultant on certain Administration forms may show that medical equivalence has been considered at the initial and reconsideration levels of administrative review, SSR 96-6p, but the ALJ did not point to any medical opinion on these forms for his rejection of medical equivalence.[5]  Instead, the only evidence he referenced was some of McMurtry's records from St. Mary's Hospital.  (Tr. 147-49, 202-14 (Exs. B3f and B9F).)  The ALJ's decision on medical equivalence is unsupported and conclusory.

Further, although obesity was rescinded as a listing by SSR 02-1p, the Administration "made . . . changes to the listings to ensure that obesity is still addressed in our listings."  SSR 02-1p.  SSR 02-1p explains how a claimant's obesity can factor into step three:

> We may also find that obesity, by itself, is medically equivalent to a listed impairment. . . . For example, if the obesity is of such a level that it results in an inability to ambulate effectively . . . it may substitute for the major dysfunction of a joint(s) due to any cause. . . .

---

[5]The record for this appeal contains two Disability Determination and Transmittal Forms (Tr. 39-40), which may be the accepted SSA forms under SSR 96-6p, but the ALJ does not cite them at step three.

13

> We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. . . . Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.

Nothing in his analysis indicates the ALJ considered obesity at this stage.

McMurtry has not named any other listing that she would have equaled. A disability claimant committed the same omission in *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1050-51 (E.D. Wis. 2005). There, the court noted that SSR 86-8 states:

> "Where an individual has a combination of impairments, none of which meets or equals a listed impairment, and each impairment is manifested by a set of symptoms and relevant signs and/or abnormal laboratory findings, the collective medical findings of the combined impairments must be matched to the specific set of symptoms, signs, and laboratory findings of the listed impairment to which they can be most closely related. The mere accumulation of a number of impairments will not establish medical equivalency."

*Masch*, 406 F. Supp. 2d at 1050-51 (quoting SSR 86-8). As such, "[a]bsent identification of the specific Listing and some demonstration that the criteria are met, plaintiff's vague contention that her impairments in combination equal a Listing fails." *Masch*, 406 F. Supp. 2d at 1050.

Nevertheless, the ALJ failed to build a logical bridge between the evidence and his rejection of medical equivalence. Further, as the case is being remanded for the other reasons set forth below, McMurtry can point out on remand any additional listings she believes applicable.

(4)     McMurtry's Credibility

McMurtry contends that the ALJ's assessment of her credibility was "seriously deficient." (Pl. Br. 12.)  Moreover, she faults the ALJ for failing to consider the majority of the factors enumerated in SSR 96-7p.

An ALJ must consider a claimant's subjective complaints if supported by medical signs and findings.  *Clifford*, 227 F.3d at 871.  But even if not substantiated by objective medical evidence, a claimant's testimony about the intensity or persistence of pain or other symptoms or their effect on her ability to work is not rejected.  SSR 96-7p. "[S]ymptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone."  20 C.F.R. § 404.1529(c)(3).  Whenever a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  SSR 96-7p.  "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints."  *Scheck*, 357 F.3d at 703 (internal quotation marks omitted).

In evaluating credibility, the ALJ must comply with SSR 96-7p.  *Brindisi*, 315 F.3d at 787.  SSR 96-7p ruling requires consideration of (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual

15

has received for the relief of pain or other symptoms; (6) measures, other than treatment, that the individual uses to relieve the pain or other symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms. Further,

> [i]t is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, *quoted in Brindisi*, 315 F.3d at 787.

A credibility finding "cannot be based on an intangible or intuitive notion about an individual's credibility." SSR 96-7p. Further, "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (internal quotation marks omitted)

The Seventh Circuit remanded *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001), for reconsideration of the claimant's credibility regarding pain. There, the ALJ found the testimony pertaining to pain was not entirely credible, citing inconsistencies with the objective medical evidence but failing to further explain those inconsistencies. *Id.* at 887. Also, the ALJ had failed to discuss MRI results supporting Zurawski's complaints and the medications he had used to relieve pain. *Id.* at 888. Because the court was unable to determine whether the ALJ had examined all relevant evidence, it remanded for reevaluation by the ALJ. *Id.*

McMurtry testified at the May 2007 hearing that she had bariatric surgery in the spring of 2006, and that her weight was about 250 pounds at the time of the hearing (down from 331 pounds). She said she wore a back brace and used its TENs unit daily and at night to send electric shocks to her back. Even with the TENs unit her pain was an eight on a scale of ten on good days and ten on bad; cold and wet weather caused increased pain. McMurtry stated she changed positions frequently, that standing was her most comfortable position, and that she needed to elevate her feet when sitting. Each day according to McMurtry, she needed to lie down to relieve constant back pain. Climbing stairs was painful and took time. McMurtry testified she took Cyclobenzaprine (a muscle relaxant) although it failed to relieve the pain. (Tr. 278-79, 282-84, 286, 291.) The muscle relaxant was substituted for narcotic medications because she did not like the effects of narcotics. According to McMurtry, she received therapy previously but when it appeared to be ineffective "they decided to give me a home machine." (Tr. 291.) Also, the pain had not decreased with her loss of weight after the gastric bypass surgery. (Tr. 291.) During the hearing, McMurtry was moving in her chair, trying to find a more comfortable position. (Tr. 292.)

McMurtry testified that household chores took her longer than usual and that daily a friend helped her to shop. Inability to sit or remain comfortable for long periods due to pain prevented her from attending church as well as her children's school activities. McMurtry indicated that she cooked simple meals but had not cooked a large meal since her accident. (Tr. 284-86.) She used to be in a dance group and cared for her daughter's hair but not anymore. (Tr. 287.) McMurtry said she could not leave her home

approximately four days each week because of discomfort and that she needed help getting off the couch or into bed. (Tr. 289.)

Although McMurtry indicated her hypertension was controlled and her headaches were minor at the time of the hearing, dysfunctional uterine bleeding affected her substantially because of excessive and lengthy bleeding and bad monthly cramping. She said she was seeing a specialist about the condition and had been prescribed an IUD for the condition. (Tr. 288-89.)

The ALJ noted the seven factors to be considered regarding credibility pursuant to SSR 96-7p. He then dealt with McMurtry's credibility as follows:

> The claimant alleges she has such severe back pain she is unable to sit for very long without exacerbating her pain. She wears a back brace with a TENs unit. She has such pain which requires that she lie down 3-4 times per week. She has to elevate her feet when she sits. She stated that standing was a little better than sitting.
> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.
> The objective medical evidence does not support the claimant's allegation of such extreme pain as to bar her from all work activity. . . . [Discussion of medical evidence.]
> . . . . As noted above, there is little objective evidence to support the claimant's allegations that her pain is so severe she cannot do even limited sedentary work. The claimant's mild degenerative condition and obesity (now somewhat reduced) account for the restrictions noted by Dr. Tracy and take full account of the claimant's subjective complaints.

(Tr. 20-22.) After discussing his RFC conclusion, the ALJ noted that it "fully takes into account the claimant's subjective symptoms and gives them as much credence as possible considering the relative lack of objective findings." (Tr. 22.)

In *Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010), the Seventh Circuit found that language identical to the second paragraph above, with an immaterial variation,[6]

> is a piece of boilerplate that appears in virtually identical language in both these cases as well as in a third social security disability case argued to us the same day. It is not only boilerplate; it is meaningless boilerplate. The statement by a trier of fact that a witness's testimony is "not *entirely* credible" yields no clue to what weight the trier of fact gave the testimony.

*Id.* at 921-22. The court reversed the ALJ's denial of benefits and remanded the case to the Administration. *Id.* at 925.

Like *Parker*, McMurtry's case must be remanded because the boilerplate statement of her testimony being "not entirely credible" fails to give the court any clue as to what weight the ALJ gave it. This court has no idea what parts of McMurtry's testimony the ALJ found credible and what parts he thought were exaggerated.

Moreover, although the ALJ noted the seven factors in SSR 96-7p, he failed to *apply* them in regard to McMurtry's credibility. Instead, he focused only on the objective medical evidence, which SSR 96-7p states is not conclusive. The ALJ failed to discuss how his credibility determination was impacted by evidence regarding the frequency of McMurtry's symptoms (she says daily); what precipitates and aggravates those symptoms (sitting and walking, for instance); the type, dosage, effectiveness, and side effects of her medications; and treatment other than medication (such as the back brace and TENs unit) that McMurtry has received for relief (or the therapy, which McMurtry says did *not* give relief). For instance, although the ALJ mentioned that McMurtry testified about a back

---

[6]The ALJ language quoted in *Parker* stated "would" instead of "could."

brace and TENs unit, he did not discuss how the prescription for and use of that device impacts McMurtry's testimony regarding pain. Also, the ALJ failed to mention McMurtry's daily activities and inability to do household chores.

Further, the ALJ did not discuss other evidence that supported McMurtry's testimony, such as the observation of Charles Goldsmith that she was always stressed regarding medicine, several medical records documenting McMurtry's chronic pain, doctors' reports of McMurtry's visible discomfort while sitting on or attempting to sit on the examination table, or examination reports of straight leg raises causing pain or impaired lateral bending. (*See, e.g.,* Tr. 90-98, 115, 121, 125-26, 134, 148.) Even consultative examiner Dr. Sean Tracy, an orthopedic surgery specialist, stated that he thought "McMurtry has some mild degenerative change in her lumbar spine which may be giving her these symptoms. There may also be some radicular component also to this." (Tr. 256, 263.)

Hence, this court is persuaded that the ALJ's credibility determination was flawed and that the ALJ's decision must be reversed.

(5)    Medical Opinions

Next, McMurtry faults the ALJ for his handling of the opinions of the treating physicians, mainly a January 17, 2006, "Physical Residual Functional Capacity Questionnaire" completed by Dr. Lisa Henriksen. The ALJ said he gave this report little weight because it was "admittedly based upon the claimant's subjective complaints" and departed from the opinion of Dr. Tracy and the other reports tracking Dr. Tracy's conclusions. (Tr. 22.) Dr. Tracy had conducted a consultative examination and found that McMurtry could stand at least two hours in an eight-hour workday, sit about six hours,

20

frequently lift or carry ten pounds and occasionally carry twenty pounds. (Tr. 260-61.) He stated that McMurtry's lifting activities should be limited and she was limited in pushing and pulling, climbing, kneeling, crouching, crawling, and stooping. (Tr. 261.)

Dr. Henriksen stated in her questionnaire that McMurtry had been her patient for four years and had been diagnosed with chronic low-back musculoskeletal pain, morbid obesity, dysfunctional uterine bleeding, and hypertension. (Tr. 215.) The doctor characterized McMurtry's pain as in the lower lumbar-sacral area, radiating to the buttocks, and precipitated by lifting, bending or being in one position too long. The doctor identified clinical findings of paraspinal tenderness in the lower lumbar-sacral area. (Tr. 215.) She opined that McMurtry could walk only one block without rest, could sit or stand only fifteen minutes at a time before needing to change position, could sit or stand a total of two hours maximum per workday, needed to walk around for five minutes every fifteen minutes and have a job permitting shifting positions at will, would need more than four unscheduled breaks per day for five minutes each, and during prolonged sitting should elevate her legs to waist height at least fifty percent of the work day in a sedentary job. (Tr. 216-17.) In Dr. Henriksen's opinion, McMurtry could never lift twenty or more pounds, rarely lift ten pounds, and occasionally lift less than ten pounds; should never twist, stoop, crouch, or climb ladders; and should rarely climb stairs. (Tr. 217-18.) Dr. Henriksen believed that McMurtry would likely be absent from work about two days per month due to her impairments or treatment. (Tr. 218.)

The questionnaire filled out by Dr. Henriksen contained sixteen questions, and question 15 had thirteen subparts. Dr. Henriksen answered subpart 15.b., which asked how long McMurtry could sit at one time before needing to get up, within the period

21

of fifteen minutes, with an additional notation of "(per patient report)." (Tr. 216.) The notation was clearly only under subpart 15.b., not under the introductory portion of question 15, and was not repeated elsewhere. For instance, it was not noted after the subpart asking how long McMurtry could sit and stand in an eight-hour workday. (*See* Tr. 217.)

From this report, the ALJ referenced only Dr. Henriksen's opinion that McMurtry could sit and stand less than two hours in an eight-hour day. (Tr. 21.) But the ALJ discounted the entire questionnaire as based on McMurtry's subjective complaints: "The undersigned gives Dr. Henriksen's final opinion (Exhibit B10F [Tr. 215-18]) little weight because it is admittedly based upon the claimant's subjective complaints." (Tr. 22.)

The ALJ's conclusion that this report rested on subjective complaints is not supported by substantial evidence. A "per patient report" notation appeared only in a subpart of the report discussing how long McMurtry could sit before needing to get up, not in reference to other questions. (Tr. 216-17.) Moreover, Dr. Henriksen identified her clinical findings and objective signs in the report. (Tr. 215.)

Generally, the Administration gives more weight to the medical opinion of a source who examined the claimant than the opinion of a source who did not. 20 C.F.R. § 404.1527(d)(1). Because of the unique perspective of and longitudinal picture from a treating physician, his or her opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *accord* SSR 96-2p; *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). "Controlling weight" means that the opinion is adopted. SSR 96-2p. A treating physician's opinion may have several points; some may be given controlling weight while others may not. *Id.* An "ALJ can reject

22

an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470.

An ALJ's finding that a treating physician's opinion is not entitled to controlling weight "does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. In determining the weight to give a non-controlling treating physician's opinion, the ALJ must consider the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the physician's evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialty of the physician, and any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel*, 345 F.3d at 470.

The weight given to nonexamining sources "will depend on the degree to which they provide supporting explanations for their opinions" and "the degree to which these opinions consider all of the pertinent evidence." 20 C.F.R. § 404.1527(d)(3). Generally, more weight is given to the opinion of a specialist regarding issues related to the area of specialty than to the opinion of a source who is not a specialist. § 404.1527(d)(5). If an ALJ asks for opinions of medical experts, those opinions are considered using these

same rules. § 404.1527(f)(2)(iii). However, the decision whether a claimant is disabled is reserved to the Commissioner; a statement by a medical source that a claimant is unable to work does not mean that the Commissioner will determine the claimant to be disabled. § 404.1527(e).

In addition to Dr. Henriksen's January 2006 opinion discussed above, she opined in a June 16, 2004, "Medical Examination & Capacity" report for the State of Wisconsin Department of Workforce Development (DWD) that McMurtry could stand and walk a maximum of one hour during an eight-hour day, could not lift more than five pounds, needed one break every hour, and could do no pushing, pulling or frequent lifting. (Tr. 111-12.) In a similar report dated July 12, 2005, Dr. Henriksen found the same limitations except that the maximum weight lifting capacity was increased to ten pounds and the restriction against frequent lifting was dropped. (Tr. 200-01.) In addition, treating physician Rebecca DeMarco, M.D., stated in a "Medical Examination & Capacity" report for the DWD that McMurtry could do no heavy or frequent lifting, needed a break every hour to rest her back, and needed a change of position every fifteen minutes. Dr. DeMarco added that McMurtry should do no pushing, pulling, bending, or stooping and that the Cyclobenzaprine caused drowsiness. She noted McMurtry's use of the back brace. Dr. DeMarco stated that with these restrictions McMurtry could participate in work no more than two hours a day. (Tr. 253-54.)

Nevertheless, the ALJ found that McMurtry has the RFC to perform sedentary work with only the following nonexertional limitations: "no driving; no working with hazards; no exposure to temperature or humidity extremes; no exposure to airborne irritants; must be allowed to change positions every 15-30 minutes; no pushing, pulling, bending or

24

stooping; and unskilled occupations only." (Tr. 19.) The ALJ did not find that McMurtry required a break every hour as noted by Dr. DeMarco or at least every two hours as recommended by Dr. Henriksen. (Tr. 19-22.) Why the ALJ rejected Dr. DeMarco's opinion and disregarded Dr. Henriksen's opinion that McMurtry would miss two days of work a month was not discussed. Further, the ALJ did not discuss—as he needed to if these treating physician reports were not controlling—the length of McMurtry's treatment relationship with these doctors, the frequency of the doctors examinations, the nature and extent of the treatment relationships, the physicians' evidence supporting their opinions, the consistency of the opinions with the record as a whole, or the specialty of the physicians, if any. *See* 20 C.F.R. § 404.1527(d)(2)-(6).

The VE testified that an acceptable absentee rate for the jobs he was citing was one day per month, and employers would generally not tolerate a five-minute break every hour. (*See* Tr. 296-97, 299.) He also testified that elevation of legs to waist-high level would start eroding the number of jobs available, as many employers would not tolerate that practice. (Tr. 298.) The treating physicians' opinions on these matters were rejected by the ALJ without explanation yet the VE's testimony confirms that these matters are material.

As with the credibility issue, the ALJ focused on the objective medical evidence rather than the factors to be considered under the SSRs and regulations. (*See* Tr. 300 ("I mean there's nothing objectively that shows up. And that's why I find RFC's from individuals like Hendrickson [sic] to be not entirely credible because there's so little to back them up.").) For these reasons, the ALJ committed an error of law and failed to

support his decision with substantial evidence, requiring reversal as to the treating physician opinions.

Further, McMurtry argues that SSR 96-9p was violated, because of findings by Dr. Sean Tracy, "the Defendant's own examining physician." (Pl.'s Br. 12.) Dr. Tracy conducted a consultative examination and filled out a disability report and medical source statement. (Tr. 255-57, 260-63.) When asked "[h]ow often can the individual perform the following POSTURAL activities," Dr. Tracy checked "Never." (Tr. 261.) SSR 96-9p states that "[a] *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work." Yet the ALJ found unskilled sedentary jobs that McMurtry could perform.

The statement in SSR 96-9p does not mean that a finding that a claimant should never stoop in her occupation must invariably lead to a finding of disability and that a contrary finding warrants remand. The use of the word "usually" implies exceptions to such a general rule. Also, SSR 96-9p states that "[c]onsultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping," and the VE here testified that a restriction of "no stooping" did not change the numbers of the three particular jobs he cited (Tr. 296). Therefore, McMurtry's argument under SSR 96-9p fails.

(6)     Step Five Assessment

Because the case is being remanded for the above-described reasons, the ALJ will have to reassess McMurtry's RFC at step five. Nevertheless, a few other RFC or step five issues need to be addressed.

As noted above, the ALJ did not cite McMurtry's dysfunctional uterine bleeding or abdominal pain as a severe impairment at step two. Instead, he stated that she "ha[d] a history of excessive uterine bleeding during menstruation but has not alleged any functional restrictions as a result." (Tr. 19.) He did not consider this condition in his RFC analysis or mention it again.

Although harmless at step two, the error is not harmless regarding RFC, as the ALJ must consider all of McMurtry's conditions together, *see* 20 C.F.R. § 404.1523 ("[W]e will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003). McMurtry's testimony regarding excessive bleeding and cramping was not contradicted. In addition, it appears supported by medical evidence. Dr. Henriksen mentions the condition in McMurtry's medical records; the results of an ultrasound showed two small uterine fibroids and ovarian cysts, which may or may not be a cause; and McMurtry was treated with provera for the condition. (Tr. 202-03, 237-38, 244-45.) Moreover, she was referred to a specialist to discuss surgical options for the fibroids. (Tr. 220.)

According to McMurtry, the condition "affects [her] a lot," because she must wear more than one tampon plus a pad, bleeds for ten days or more, and cramps very

badly.  (Tr. 288.)  Contrary to the ALJ's comment, this is more than mere "excessive uterine bleeding during menstruation" without functional restrictions.  Such bleeding and cramping may require more frequent breaks at the workplace and the length and amount of the bleeding and accompanying pain may interfere with McMurtry's work abilities.  The ALJ should have considered this condition in regard to RFC.

In addition, the ALJ did not discuss sufficiently whether McMurtry's obesity exacerbated her conditions.  Although he cited obesity as one of her severe conditions and said that his RFC finding took obesity into account, he followed that with a statement that he "would expect, as the claimant's doctors do, that as the claimant loses weight after her bariatric surgery, her back pain will improve."  (Tr. 22.)  But at the hearing McMurtry still weighed 250 pounds (Tr. 277-78); whether her weight would drop in the future did not address her condition from December 30, 2003, through the hearing date.  Moreover, she testified that her symptoms had not decreased with her eighty pounds of weight loss and the ALJ's credibility determination was insufficient for rejecting that testimony.

Still, some of McMurtry's arguments must be rejected.  She contends that "[t]he ALJ . . . violated Ruling 96-8p by not correctly providing a function-by-function assessment of RFC." (Pl.'s Br. at 14.) Though the Commissioner does not address this argument, the Seventh Circuit has rejected it.  In *Knox v. Astrue*, No. 08-3389, 2009 WL 1747901, *5 (7th Cir. June 19, 2009), a disability claimant argued "that the ALJ erred by failing to perform a function-by-function analysis of his ability to perform daily living and work-related activities."  Like McMurtry, the claimant "assert[ed] that social security rulings require a function-by-function assessment."  *Id.*  In response, the Seventh Circuit stated: "Although the 'RFC assessment is a function-by-function assessment,' SSR 96-8p, the

28

expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Id.* The Seventh Circuit found that the ALJ satisfied discussion requirements by analyzing the objective medical evidence, Knox's testimony, and other evidence. Although not precedential because unpublished, *Knox* is persuasive, and this court agrees with it.

Also, McMurtry argues that the ALJ's use of jobs available state-wide does not prove there are jobs near McMurtry's home that she could perform within her RFC. (Pl.'s Reply Br. 9.) However, the case she quotes for her "reasonable proximity" test uses the state of Wisconsin as the unit of analysis. *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004). The Seventh Circuit observed that the "vocational expert['s] . . . function in a social security disability hearing is to determine which jobs the applicant for disability benefits can do and how many such jobs exist in the applicant's *state*" and "[a] vocational expert can testify to the number of light jobs in *Wisconsin*." *Id.* (emphasis added). Although the *Barrett* court indicated that the test is whether there are jobs in "reasonable proximity to where [the claimant] lives," state-wide data fit the bill. *Id.*; *see also* 20 C.F.R. § 404.1566(a) ("We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether—(1) Work exists in the immediate area in which you live . . . .").

Lastly, McMurtry complains that "the ALJ failed to determine if the VE's testimony was consistent with the *Dictionary of Occupational Titles* (DOT) as required by SSR 00-4p." (Pl.'s Br. 15.) The ALJ asked the VE for jobs available at the unskilled and light or sedentary levels that did not require driving; did not require exposure to hazards,

temperature or humidity extremes, or airborne irritants; and permitted a change of position every fifteen minutes without loss of productivity. (Tr. 294-95.) The VE responded that in Wisconsin 11,210 surveillance system monitor 379.367-010 positions, 10,250 order clerk 209.567-014 positions, and 1,020 call out operator 237.367-014 positions existed. He indicated that these numbers did not change if the ALJ added no pushing, pulling, bending, or stooping. (Tr. 295-96.)

It is unclear whether error occurred here, as the VE said that McMurtry could perform the job of order clerk 209.567-014, yet according to McMurtry the order clerk job is semi-skilled. In response, the Commissioner points out that although some order clerks (code 249.362-026, for instance) are semi-skilled positions, an order clerk for food and beverage, code 209.567-014 (the number used by the VE) is unskilled. (Def.'s Mem. in Supp. 20 n.3.) The pertinent DOT pages are not in evidence, but in any event any error is harmless. There remain a significant number of jobs in Wisconsin for McMurtry to perform—11,210 surveillance system monitor and 1,020 call out operator jobs. In *Coleman v. Astrue*, No. 07-1729, 2008 WL 695045, *5 (7th Cir. Mar. 14, 2008), the Seventh Circuit found that "even subtracting all the industrial/manufacturing jobs and counting the only job consistent with the DOT—order clerk—1,500 jobs would still be available to a person with Coleman's limitations." *Id.* As the Seventh Circuit had already held that 1,400 jobs fell within the parameters of a sufficiently significant occupational base, "[t]he ALJ's failure to comply with SSR 00-4p was therefore harmless." *Id.* Here, the 12,230 jobs still available to McMurtry are more than enough to satisfy the ALJ's burden.

McMurtry latches onto language in *Overman v. Astrue*, 546 F.3d 456 (7th Cir. 2008), regarding the VE's reliability: "A VE's testimony can satisfy this burden only if that

testimony is *reliable*." *Id.* at 464.  However, she has not shown that the remaining data from the VE is unreliable.  Even so, the other jobs noted by the VE were enough to demonstrate there were a significant number of jobs for McMurtry.

Of course, additional VE testimony may be required depending on whether the ALJ on remand alters the RFC findings after reconsideration of the matters discussed above.

CONCLUSION

Now, therefore,

IT IS ORDERED that the decision of the Commissioner is reversed and McMurtry's claim is remanded to the Commissioner under sentence four of § 405(g) for reconsideration of the matters described above.

Dated at Milwaukee, Wisconsin, this 27th day of October, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE